Glen McGUIRE, Appellant,

v.

**TEXAS FARMERS INSURANCE COMPANY, Appellee.**

No. 09-85-261 CV.

Court of Appeals of Texas, Beaumont.

Jan. 15, 1987.

Rehearing Denied Feb. 26, 1987.

Dale Dowell, Rienstra, Dowell & Flatten, Beaumont, Donald Kelley, Dunn & Kelley, Orange, for appellant.

Dewey J. Gonsoulin, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, John Cash Smith, Mehaffy, Weber, Keith & Gonsoulin, Orange, for appellee.

## OPINION

PER CURIAM.

The origin of this litigation was a suit for declaratory judgment relief pursuant to *TEX.REV.CIV.STAT.ANN. art. 2524-1* (Vernon 1965). Texas Farmers Insurance Company [Texas Farmers] sued its own insured Glen McGuire seeking a declaration that it was not obligated to satisfy any judgment against Glen urging there was noncoverage defense under its automobile liability insurance policy.

Glen then sued Texas Farmers Insurance Company for breach of its insurance contract alleging violation of the Texas Deceptive Trade Practices Act, *TEX.BUS. & COM.CODE ANN. sec. 17.46* (Vernon Supp.1986). Glen also alleged Texas Farmers violated *TEX.INS.CODE ANN. sec. 21.-21* (Vernon 1981).

### The Factual Background

It was clearly revealed to one Bearden, an adjuster-investigator, that, in the September 21, 1979 statement from Glen (which was taken by way of a recording) that Glen was a troubleshooter for Gulf States and that he had the use of a Gulf States truck when he was on call. Glen had been to his own cow pasture and was on his way home when a vehicle collision occurred, being the genesis of this litigation. Glen was driving a Gulf States service truck. Since he was on call at the time, he needed to use that truck because of its two way radio. Glen had been an employee of the utility company for 27 years. He had a truck available for use when on call. Bearden knew also that Glen, in the recorded statement, had stated that he was headed east on Farm Road 1130 and the road was very narrow, being a black-topped road; that he went off the shoulder where there was about a two-inch drop; that when he got back on the black-top he drove over one foot or maybe fourteen inches on the other side of the center stripe. Glen hit a vehicle heading in the other direction and the two people therein sustained injuries. Glen was taken to the hospital by ambulance. The two people in the other automobile had also been taken to St. Elizabeth Hospital in Beaumont by ambulance. Bearden could logically conclude that there was probable liability on Glen's part for personal injuries and physical damage to the other vehicle. Glen also revealed that the highway patrol investigated the accident and that he was given a ticket for: "being in the other lane and not passing, they also gave me ticket for DWI because I couldn't stand up straight". Bearden then asked Glen if he had been drinking and Glen replied: "I'd had two beers that whole day, uh, I got off at 4:30 and it was 8:00 when this happened. Anyway, that's the way they looked at it." He then asked Glen about what vehicles that Glen, himself, personally owned and where they were located. He then had Glen McGuire repeat his name and the adjuster-investigator concluded by saying:

"This is John Bearden, today's date is, uh, September the 21st, 1979, time of day is about 2:10 p.m.

This is a true transcription of the recorded statement of *Glen McGuire* to the best of my ability."

All of the above information was obtained in Glen's first statement of September 21, 1979.

### The Duties of Adjuster-Investigator and Texas Farmers Insurance Company

Having this information, we decide that certain duties and responsibilities devolved upon Beardon as well as the insurer, Texas Farmers. We think the landmark, governing case is *Employers Casualty Company vs. Tilley*, 496 S.W.2d 552, 558 (Tex.1973), where we find:

"If a conflict arises between the interests of the insurer and the insured, the attorney owes a duty to the insured to immediately advise him of the conflict. These principles were enunciated in *Automobile Underwriters' Insurance Co. v. Long*, 63 S.W.2d 356 (Tex.Comm.App. 1933)...."

■ We decide at this point that there was an obvious conflict of interest between Texas Farmers and Glen concerning an exclusion or exception under the insurance policy. It is correct that the statements were taken by an adjuster rather than an attorney, but to give meaningful effect to the holding in *Employers, supra,* we hold the same rule should apply to the adjuster or investigator under this record. In *Employers, supra,* the defense was noncoverage for failure to timely give notice of a personal injury accident. Employers claimed that Tilley, their insured, knew about the occurrence; or, if he didn't actually know about it, he had imputed knowledge through his foreman, Grady Fore. In brief, the defense in *Employers Casualty, supra,* was that Tilley gave late notice. Tilley claimed that although the accident occurred on November 25, 1967, he did not know about it till he was sued on September 19, 1969, not quite two years later. The high court summarized thusly:

"The controlling question with respect to the affirmed portion of the trial court's summary judgment in favor of Tilley is whether the summary judgment proof establishes as *a matter of law that Employers waived or is estopped from asserting its policy defense of late notice. ...*" (Emphasis ours)

The court continued:

"[W]e are still confronted with the undisputed proof that it was the attorney furnished by Employers to represent Tilley in the Starky suit who at the same time worked for Employers adversely to Tilley *in developing the evidence upon which this suit for denial of coverage is based; that the development of evidence and briefing against Tilley on the coverage question was sought and paid for by Employers,* without Tilley being informed of the conflict of services being performed by his attorney; that Employers, through this attorney, continued to represent Tilley for nearly 18 months before withdrawing; and the forceful argument *that such conduct constituted a waiver of the policy defense and was so contrary to public policy that Employers is estopped as a matter of law from denying its responsibility* for the defense of the Starky case...." (Emphasis added)

The court characterized this action as contrary to public policy. Quoting with approval from *Automobile Underwriters' Ins. Co. v. Long,* 63 S.W.2d 356, 358–9 (Tex.Comm'n App.1933), the court wrote further, in *Employers:*

" 'When counsel were employed by the company they became Long's [the insured] unqualified attorneys of record, and as such they owed him the duty to conscientiously represent him, and if the point was reached where his interests and those of the company conflicted, he should have been so informed and given the opportunity to protect himself.' "

We determine these duties must apply to the adjuster-investigator under this record. After the taking of the September 21 statement, Bearden should have told Glen that there was a conflict of interest, advising Glen to select his own representative or attorney in order to protect himself. In the case at bar, the defense was noncoverage in that Glen used, regularly, a truck owned by Gulf States. Therefore, Glen's personal insurance policy would not apply to Gulf States' truck when Glen was using it.

It is important to remember that a judgment of over $12,000 has been lodged against Glen, individually.

### The Second Statement

When the second signed statement of September 28th was taken from Glen, certain gaps in the noncoverage defense were closed. The second statement of September 28, 1979, from Glen contained the following:

"I have been employed for 27 years. I drive a Gulf States truck regularly and every day in my work ... I have driven a Gulf States truck in my work and responsibilities for Gulf States for just about my entire 27 years. I do trouble shooting for Gulf States and am on call in fulfilling my trouble shooting duties. I was on call on 9–16–79, the day of the accident. Not only am I allowed to use the Gulf States truck for personal as well as Gulf States business when on call but also I am instructed to use the truck so as to be available to respond to calls. The involved Gulf States truck is equipped with a two way radio and when I am away from the truck I must be available by phone and advise Gulf States of the phone number.

"... *I use the truck within a designated radius and I was within this radius at the time of my accident. My only restriction in use of the Gulf States truck is that I be within my designated radius. I have no other restrictions. Gulf States expects me to use the Gulf States owned truck even for personal trips within my radius so I will be in position to respond to trouble calls.* As already stated, I use the Gulf States truck regularly, every day in my work and while on call.

"On 9–16–79, at the date and time of my accident, I was operating a Gulf

States owned truck and *I was operating this truck well within the scope* and permission and instructions from Gulf States Utilities."

/s/ Glen McGuire

(Emphasis ours)

This statement clinched the "noncoverage" defense.

In *Automobile Underwriters'*, 63 S.W.2d at page 359, the court wrote:

"[I]f the point was reached where his interests and those of the company conflicted, he should have been so informed and given the opportunity to protect himself....

"The policy obligated the company to defend the suit, and, having entered upon the defense, it was in no position to require Long, without consideration and without his full understanding, to waive himself out of court.

"When an insurance company contracts to defend suits against the insured it is bound in good faith to perform this obligation and has no right to insist upon the insured signing away his rights as a condition precedent to the performance of this duty."

The September 28, 1979 statement can be correctly referred to as a "coverage statement", since it pertains to the coverage question. The same was written out in long hand by Bearden. Sometime before or perhaps contemporaneously with the "coverage statement", Bearden also obtained a general non waiver agreement signed by Glen. This non waiver agreement has no date. Thereafter, by letter of November 15, 1979, Bearden advised Glen that his policy with Texas Farmers did not provide coverage for any liability which would result from the collision made the basis of the damage suit. That letter reads:

"Dear Mr. McGuire:

This is written confirmation of our prior conversations advising you that your policy with this company would not provide coverage for any liability and/or material damages claims which may have resulted from the accident of September 16, 1979.

"Sincerely,

/s/ "John Bearden"

In March, 1980, a suit was filed against Glen and Gulf States by the parties in the other car for money damages for personal injuries as well as property damage. On March 6, Texas Farmers sent McGuire a reservation of rights letter and employed counsel of its own selection to defend Glen in that lawsuit. The case went to trial August 30, 1982 and, later on, a judgment was entered against Glen and Gulf States, jointly and severally, in the amount of $12,-347.55 with interest and court cost in the amount of $827.70. Thereafter, Texas Farmers refused to satisfy the judgment against Glen on the ground of noncoverage.

*Noncoverage Defense*

The noncoverage defense was based on this pleading filed by Texas Farmers:

"The plaintiff [Texas Farmers] has denied coverage for said accident because the vehicle being driven by the defendant, Glen McGuire, at the time of the accident of September 16, 1979 was neither an owned automobile nor a non-owned automobile as those terms are defined in the policy of insurance issued by the plaintiff [Texas Farmers] to the defendant...."

The course of conduct engaged in by Texas Farmers in the case sub judice emphasizes and makes necessary the rule that noncoverage can be waived and estoppel can apply to Texas Farmers in such a situation.

■ Since *Automobile Underwriters' Ins. Co. v. Long*, 63 S.W.2d 356 (Tex. Comm'n App.1933) and especially since *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552 (Tex.1973), the commands of the Supreme Court to insurers are that when conflicts arise, the insurer must warn the insured of the conflicts and give him a full opportunity to adequately defend himself with advice and counsel from sources other than the insurer. Hence, Texas Farmers' failure to do so estopped it from denying the insured coverage.

## The Non Waiver Agreement

The non waiver agreement is general and overly broad in its terms. No specific or general reasons are set out for the taking or the requesting of the said agreement. It was not disclosed in the instrument that the basis was a noncoverage defense. The document, "Non Waiver of Rights", reads as follows:

"The undersigned requests and authorizes Texas Farmers Insurance Company to investigate, negotiate, settle, deny or defend any claim arising out of an accident or occurrence which happened on or about September 16, 1979.

"It is agreed that any such action taken by the Texas Farmers Insurance Company either before or after the signing of this agreement will not waive any of the rights of the undersigned or of said Texas Farmers Insurance Company under any insurance policy."

Hornbook law dictates that a waiver, to be valid, requires the giving up of a known, appreciated right. The non waiver of rights was undated. Glen had less than a high school education. The adjuster had been in the adjusting business for about 3 decades. Such a non waiver agreement, since it is undated and since it is so broad and general, would not authorize Texas Farmers to actively work against Glen seeking to establish a noncoverage defense. A careful reading of "coverage statement" demonstrates that Texas Farmers was trying to make certain that it would not have to pay any judgment against Glen. It did this without informing Glen of the conflict of interest. Texas Farmers certainly did not, in a meaningful way, afford Glen an opportunity to employ and hire his own counsel before signing the "coverage statement" of September 28.

From *Employers Casualty*, 496 S.W.2d at page 560, we find:

"The obligation of Employers and the attorney to notify Tilley of the specific conflict, *and the consequences of their failure to do so are not relieved by the standard non-waiver agreement.*" (Citing authorities) (Emphasis ours)

Here we can easily substitute Texas Farmers for Employers and the adjuster for the attorney and substitute Glen for Tilley. And much too late, Texas Farmers acknowledged and recognized its own obligation to its insured in this respect by sending him a reservation of rights letter of March 6, 1980, *wherein it advised Glen that he was at liberty, at his own expense, to engage an attorney of his own choice.*

It is interesting to note that by a speed memo dated 11–12–79 directed toward the insured, Glen, from the department and regional office to John B. (apparently John Bearden), stated: "You [John B.] have permission to deny coverage for this accident." We must remember this admonition from the Supreme Court in *Employers Casualty*, 496 S.W.2d at page 561:

"Whether Employers would have been as successful in gathering evidence through other attorneys as it was through the attorney that Tilley and his employees thought to be looking after nothing but Tilley's defense, is a matter of speculation. It falls in the realm of what might have been. We are here concerned with what actually occurred—the means by which Employers actually developed the evidence of Grady Fore's knowledge and Tilley's alleged knowledge of the accident which occurred on November 25, 1967, on which the present declaratory judgment suit is based."

We concede that the *Tilley* case involved attorneys rather than adjusters, but counselors for carriers as well as adjusters and investigators for liability carriers are purporting to be acting on behalf of the insured and the consequences to insured are, in practicality, the same. We note that *Tilley* sets out certain Canons of Professional Responsibility applicable to attorneys (being under scrutiny by the Supreme Court). Insurance adjusters are not under canons and are not subject to Supreme Court scrutiny as are attorneys. It is, therefore, more compelling and necessary, in a case such as this one, that the appellate court carefully scrutinize the actions of the insurance adjuster-investigator. We are constrained to apply to the insurance adjuster-investigator, under this record, the

reasoning and rationale of *Tilley* and *Long, supra.* In the case sub judice, the insurance company sent out its own adjuster to investigate a potential personal injury claim against the insured. After having certain basic information that showed a probability of liability and a strong probability of money damages recovery against Glen, Bearden proceeded to obtain a non waiver agreement as well as a second statement to build a perfect and complete defense of noncoverage. This put the adjuster in a position of performing services for the insured and, at the same time, performing services for the insurance company—their interests being in definite conflict. This gave rise to a duty to speak and *Tilley* holds that estoppel arises from such silence.

"Even when no violation of public policy is involved, an estoppel may arise from silence, where there is a duty to speak, and failure to do so worsens or prejudices the position of the party to whom the duty is owed. *Burnett v. Atteberry,* 105 Tex. 119, 145 S.W. 582 (1912). Employers contends that no prejudice has been shown as a matter of law to have occurred by reason of its conduct or silence. We disagree. Tilley was led to make his employees available for statements, sometimes on his own time and at his own expense, with no reason to think that his attorney was working other than in his own interest. *The second statement taken from his foreman, Grady Fore, on March 12, 1970, admittedly had as one of its purposes the development of late notice evidence against Tilley.* It was taken by the attorney for that purpose at the request of Employers; and from that date until he withdrew from the Starky case on or about May 11, 1971, this attorney continued at various times to send evidence, information and briefs to Employers, at its request, on the late notice question. Such attorney originally engaged by Employers to represent Tilley will be referred to hereinafter as 'Employers—Tilley attorney,' to distinguish his actions from those of the present attorney engaged by Employers to bring this suit

against Tilley for a declaratory judgment." (Emphasis added)

### Deceptive Trade Practices-Consumer Protection Act

■ Adhering to the reasoning, rationale and holding in *Employers Casualty Company v. Tilley, supra,* and *Automobile Underwriters' Insurance Co. v. Long, supra,* we hold that the adjuster-investigator's course of conduct was a misleading and deceptive series of acts and practices which were done in the conduct of trade or commerce. We conclude, especially, that the taking of the so-called "coverage statement", which was used to perfect the insurance company's "noncoverage" defense, was a misleading and deceptive act or practice in the conduct of the adjuster-investigator's trade. As a result, these acts or practices are unlawful and subject to the consumer protection division. We also affirmatively hold that the adjuster-investigator's acts and practices violated *TEX.BUS. & COM.CODE ANN. sec. 17.46(a) and (b)(12)* (Vernon Pamph.Supp.1986). Hence, *TEX.BUS. & COM.CODE ANN. sec. 17.-50(b)(4)* (Vernon Pamph.Supp.1986) affords McGuire treble damages under the 1977 Act, allowing him also to recover court costs and reasonable attorney's fees. Under the 1977 law, McGuire had certainly been adversely affected by an "act or practice" declared to be unlawful by *sec. 17.46;* and, under the 1977 law, McGuire was entitled to three times his actual damages which were and are the amount of the judgment now in force against him.

It should be borne in mind that the contract of insurance was entered into in July of 1979. The 1979 amendments became effective August 27, 1979. The actions and practices of the adjuster-investigator, Bearden, began in September, 1979. The amount of the judgment against Glen (his actual damages) should be trebled since the acts and practices of the adjuster-investigator were committed knowingly. In addition, we hold that the practices and actions of Bearden constituted unconscionable actions. *TEX.BUS. & COM.CODE ANN. sec. 17.44* (Vernon Pamph.Supp.1986).

## The Insurance Code

*TEX.INS.CODE ANN. art. 21.21 sec. 16(a)* (Vernon 1981) provides relief available to injured parties. We hold the actions of Bearden to have injured McGuire and to be, as a matter of law, unfair and deceptive practices in the business of insurance, as well as a condemned practice as defined by *TEX.BUS. & COM.CODE ANN. sec. 17.46* (Vernon Pamph.Supp.1986) and *TEX.INS.CODE ANN. sec. 16(b)(1)* (Vernon 1981).

Prior to the recent amendments, *TEX. INS.CODE ANN. art. 21.21, sec. 16(a)* (Vernon 1981), set forth that any person who has been injured by another's engaging in unfair and deceptive practices in the business of insurance, or in any practice defined by *sec. 17.46* of the Business & Commerce Code, as amended, as an unlawful deceptive trade practice may maintain an action against the company or companies engaged in such acts or practices. And if such a suit is filed under *art. 21.21, sec. 16(a)*, a prevailing plaintiff may obtain 3 times the amount of the actual damages plus court costs and attorney's fees reasonable in relationship to the amount of work expended. Glen has availed himself of *art. 21.21, sec. 16(a)*.

## Liberal Construction Mandated

*TEX.BUS. & COM.CODE ANN. sec. 17.-44* (Vernon Pamph.Supp.1986), entitled "Construction and Application" reads:

"This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty *and to provide efficient and economical procedures to secure such protection."*
(Emphasis added)

Unconscionable action or course of action means an act or practice which, by taking advantage of the lack of knowledge, ability, experience or capability of a person, results in a detriment to that person. *TEX.BUS. & COM.CODE ANN. sec. 17.-45(5)* (Vernon Supp.1987).

The jury found that Texas Farmers, through its agents, failed to disclose to Glen that he should consider employing his own attorney before giving his second statement of September 28, 1979.

## Glen's Consumer Status

The insured was a consumer and was entitled to advance a statutory cause of action under the Texas Deceptive Trade Practices Act. *TEX.BUS. & COM.CODE. sec. 17.46(a), (b)(12)* and *sec. 17.50(a)(3, 4)* (Vernon Pamph.Supp.1986). And, furthermore, the then relevant section of the *TEX. INS.CODE ANN. art. 21.21, sec. 16* (Vernon 1981), provided for treble damages if brought by *any person*, especially an insured who has been injured by another's act or conduct amounting to an "unfair or deceptive act or practice in the business of insurance." *Allstate Insurance Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). Indeed, the relevant section, being *art. 21.21* of the Insurance Code, allows a cause of action to lie for treble damages on behalf of any person (whether consumer or not).

A major theory of recovery for Kelly in *Allstate, supra,* was that Allstate had failed to follow the Stowers doctrine. *G.A. Stowers Furniture Company v. American Indemnity Co.,* 15 S.W.2d 544 (Tex. Comm'n App.1929, holding approved). In *Allstate, supra,* the court reasoned that the Texas Deceptive Trade Practices Act conferred a cause of action under the Stowers doctrine and we hold that the D.T.P.A. confers a cause of action upon McGuire under the *Tilley* case.

## The Stipulations

The attorney's fees, by stipulation, amounted to $11,130.00 for the trial; for appeal to the Court of Appeals, $2,500.00; for preparing and filing an Application for Writ of Error to the Supreme Court of Texas, $1,500.00, and for arguing before the Supreme Court, in the event the writ of error is granted, $1,000.00. These fees are recoverable and awarded to this prevailing consumer, as well as the court costs, now in excess of $827.70. We decide that Glen is entitled to recover treble his actual dam-

ages which are, as a matter of law, $12,-347.55 with interest. Hence, we order, adjudge and decree that Glen recover from Texas Farmers Insurance Company the following:

1. His actual damages (being $12,-347.55, plus interest on said $12,347.55 at the rate of 9% per annum from October 21, 1982, to October 7, 1985, plus court costs of $827.70), all of which are trebled, with interest upon said trebled amount at the rate of 10% per annum from October 7, 1985, until paid;

2. All costs of court incurred in the Trial Court and all costs occasioned by this appeal, including costs for the transcript and statement of facts;

3. Attorneys' fees of $11,130 for trial and additional attorneys' fees of $2,500 for this appeal to the Court of Appeals;

4. Attorneys' fees of $1,500 for responding to Application for Writ of Error to the Supreme Court of Texas in the event Application for Writ of Error is filed;

5. Attorneys' fees of $1,000 for arguing before the Supreme Court of Texas in the event Writ of Error is granted and argument is had.

The District Court's Judgment is reversed. We render judgment for Glen McGuire as ordered above.